Be seated. Our next case from the District of Maryland, Mr. Fletcher v. Maryland Transit Administration, Mr. Hansel, nice to have you here, sir. Thank you, Your Honor. The honor is mine and the pleasure is mine. May it please the court, it's my honor today to represent Richard and Joanne Fletcher. This case was wrongly dismissed below because the district court failed to recognize six different important duties that were owed to our clients by the various defendants. Because the district court failed to recognize the inapplicability of the public duty doctrine and important exceptions to that doctrine. I'd like to briefly touch on what the six duties are that we believe exist in this case and then go through each in some detail as the court desires. The first is that the defendants created the danger. The second is that the defendants accepted the duty of protection by instituting monitoring of the assailants at issue and then withdrawing that support from the community. The third is that a special relationship existed between the defendants and the students. The fourth is that a special relationship existed between the defendants and the plaintiffs. The fifth is the creation of a special temptation or opportunity for criminal conduct, which gives rise to a duty. And the sixth and final element or the sixth and final source of duty is the general common law notion of duty and the test of which we're all familiar. Was this bus dedicated to the transportation of students only or was it just in general public transportation? It was an MTA bus, Your Honor, that the school had contracted with MTA, which is the transit authority, to pick up these students. There was also the possibility of others on the bus. But the school had control of the situation. So it was not just a school bus? No, it was an MTA bus. MTA is what? Metropolitan Transit Authority? It's the Maryland Transportation Authority. Maryland Transportation Authority. Yes, sir. Was the bus ride mandatory for these students? No, Your Honor. They could walk in any direction. But the school moved the bus stop from picking up at the school to an area where the only reasonable way of getting there is through our client's neighborhood. School or MTA? Well, that's part of the question for the case, Your Honor. Everyone's pointing the finger at each other. But the way it worked as a practical matter. How far did they move the bus stop? A number of blocks, Your Honor. Well, what's the number? It was two or three blocks depending on which path you take, yes. Depending on which path you take? Yes, Your Honor. We know the record will show the locations. It will, Your Honor. If you take a left or a right, it might make a difference of a block. A block? Yes, Your Honor. And your client lived on one of those routes? Yes, Your Honor. A longer route? Yes, correct, Your Honor. A three-block route? Well, no. It depends on which way you go. But he lived in the most reasonable route to get to the school bus stop. A two-block route? I think so, yes, Your Honor. Well, one other question, and I'll leave you alone. The order doesn't indicate whether it was with prejudice or without prejudice. What is the state of that, without prejudice? Your Honor, it doesn't. As you point out, it doesn't indicate. It doesn't indicate much. The operative portion of the order is only a paragraph long, so we're left to guess. And I'm not here to put words, obviously, in the trial court's mouth. The presumption is that it's with prejudice, and that's why we're here today. But, again, that's a question for the trial court. It's one of the problems with this order. We have a three-page order in response to what were some very complicated issues. Well, the order is one page. I think the order of dismissal just says the action is dismissed. It's one page. That's correct, Your Honor. It's an opinion. My apologies, yes, Your Honor. It's a three-page opinion. To be more exact, it's a three-page opinion. There's only about a paragraph in that opinion that deals with any of the merits. Right, but there's a three-page opinion. And the dismissal in the one-page order says this action is dismissed. Correct, Your Honor. That's exactly right. And that's presumed to be with prejudice? We're here in case it is, Your Honor. I mean, that's the risk we take from our side of the equation. We're not in a position to roll the dice and take that risk. If this court finds that it's without prejudice and wants to send us back down, I would suggest the court do so. We haven't made an argument that it's without prejudice or tried to amend or anything, have you? We have not, but, you know, that's the risk that you take. How can we be called upon to decide that? I'm sorry, Your Honor? How can we be called upon to decide that? It's not presented to us. If the court determines that it's jurisdictional, you can raise it sui sponte. And that would be, again, a matter for the court if you determine it's jurisdictional. If it rises to the level of a jurisdictional issue, you can indeed raise it on your own behalf as the court today has. As I understand, no parties have raised it. But the important thing that this order, and it's really one paragraph of operative language ignores, is all of the layers of duties that are at issue in this case. And so, for instance, you have the fact that the defendants created the danger to begin with. And this court in Pender recognized that if there is a state-created danger, then… But your client left his home and went out in the street and confronted these kids. But that's not… That doesn't answer the question of whether or not there's a duty. In other words, in the… Judge Motz said a lot of that. He said Mr. Fletcher left the safety of his home to confront the students. Yes, Your Honor. And it would be up to a jury to decide whether or not he accepted the risk of what was going to happen after that. But that wasn't what Judge Motz ruled on. Judge Motz said there's no duty in the first place. When, in fact, there very clearly was because the defendants created the danger by forcing the students through this neighborhood. And this court in Pender cited with approval a number of cases from other jurisdictions that are very similar. So, for instance, when officers drive prisoners to a store or to a workplace, when a parolee is provided with an automobile, the state itself is creating the danger, just as here the state created this danger in forcing the students through this particular neighborhood. And this is a highly dangerous group of people. These are some of the most dangerous people in Baltimore. How many defendants did you sue? I believe altogether there were 12, Your Honor. There were seven students who were involved in the attack that ranged in age up to 20 years old. They had criminal backgrounds. They were in what amounts to a reform school because of their troubled backgrounds. And there were numerous complaints by the community. Yet the defendants moved the school bus stop from the school to force this walk. Then in response to the complaint that was monitoring that the defendants withdrew, which brings me to another issue. Let me ask you about that. So is it your position that once the monitoring program was put in place, that the defendants had an obligation forever to continue the monitoring program? They could never withdraw it? Until there was reason to believe the danger had subsided. And there was no such reason in this case. So, for instance, I refer the Court to Section 323 of the Restatement of Torts, which has been adopted in Maryland in Miller v. U.S., Heinrich, and the E.G. Rock case. And in that section, when one undertakes to protect someone else, a duty arises to perform that function in a way that doesn't increase the risk. And here there's no question but that they increase the risk from zero when the students were being picked up at the school to obviously 100 percent when they were forced through the neighborhood. And then secondly, there were none of these issues when the monitoring was taking place, no attacks. And when they did away with the monitoring, here our clients are attacked. Well, the defendants say with respect to the relationship that maybe you're making a distinction here between the school and the MTA, but the schools at least would suggest that once the students leave the school, that's the end of the matter for them. Except that isn't the case. So, for instance, here's why we know that. Number one, they put the monitors in place. So the school was able to put the monitors in place and demonstrated that indeed they had the ability to stop the problem, to monitor it off school. Well, the fact that they may have done that gratuitously, at least from their view, doesn't mean that they had a duty to continue to do it. Except under the restatement, which covers even gratuitous efforts to protect someone else and says you can be liable for doing those incorrectly. In addition to that, there is also a student code of conduct that the school writes in response to, in accordance with the policies of many of the other defendants, the student code of conduct explicitly states that it covers students off campus coming to and from school and to and from bus stops and so on and so forth. And we've cited that in our papers in a footnote. So the school had here the ability to control the students. This is not the case where the school can merely wash their hands of the students. And we see that in Pender because Pender cites, for instance, Nishiyama v. Dixon County. It's a Sixth Circuit case but cited with approval by this court where a duty arose because the state provided an unsupervised parolee with a squad car and he drove off. Now the state in that instance could have said we have no more custody over him, he's out of our hands, he's driven off with this squad car that we gave him, and therefore we can wash our hands. Where is the line drawn between the responsibility of the school and the responsibility of the parents? I think the line is drawn when the question is whether or not there is an ability to control. And here we know there's an ability by the school to control for a number of reasons. One, it's right in their policy that they can do it. Two, they've demonstrated the actual ability to do it regarding these students in this neighborhood on Mr. Fletcher Street. So we know that they can control these students. The defendants want to change the test to one of custody, immediate physical custody, which it is not. This court in Pender in adopting the case I cited earlier made it clear that even once you're out of the custody of the state, if the state in effect put the wheels in motion to create that danger, the state is responsible. And that's in the case of what? Parolees and others? In that case it was an unsupervised parolee. And that's a different context, isn't it? Every context is different, Your Honor, but I don't think materially, which is that's the question. These students are extremely dangerous. They have criminal histories. They, again, are in effect- If they weren't, or maybe some of them may have been, I suppose, under the supervision of the criminal justice system, right? Some likely were. I can't answer that directly, Your Honor. But what I can tell you is that they were assigned to this school because they couldn't be permitted in any other school. This was, in effect, what we used to call in its disfavored, I guess, reform school or situation where these were some of the worst of the worst. So you're saying it is a reform school? Yes, Your Honor. And so a duty arose because of the- But they aren't in custody? No, Your Honor, but that's not the test. The test is control, not custody. And the school here demonstrated that it could enforce control. And I'll give you another example, moving on to the third source of duty here, which is special relationship. If there is a special relationship between the defendant and the wrongdoer, or the defendant and the plaintiff, and either will do, then we, again, defeat the doctrines that are cited by the defense. Here, there is case law that we've cited to the court that there is always a special relationship between students and a school. 24-7? I'm sorry? 24-7? No, but certainly, again, it comes- So where do we draw the line? Again, I think very clearly, when there is an actual demonstrated ability to control, or importantly in this case, when there is at least enough evidence of that question to go to a jury. We're here. This case hasn't been thrown out on a motion to dismiss, and there is at least a jury question as to whether or not the school had the ability to control these students once off campus because they had actually demonstrated the real on-the-ground ability to control them through the monitoring, number one. And number two, they had policies, that it was the school's policy to control these students. The school wrote that for themselves, and that the students were subject to that policy and subject to discipline through that policy. So that creates, at the bare minimum, a jury question on this point of where do you draw the line between- How were those policies different from any policies a school would implement at any school? Well, the policies themselves were likely not terribly different, but the actual monitoring was different because it's not typical that that kind of monitoring takes place. It took place because of the notice to the school of the dangerous propensities of these people. So these are not individuals who are your typical school children that you might be familiar with. These are very dangerous people who are violent and with behavioral problems and, again, ranging in age up to 20 years old. So some of the case law we've cited talks about the dangerous propensity. And there's a distinction between custody and control. Control is sufficient when it's grouped with a dangerous propensity to act. That creates this special relationship, as does the student and school relationship. Had Mr. Fletcher suffered any problem with these people before the incident? Not physical altercations, Your Honor, but there were- How is he in a worse position than he was without the monitoring? I mean, he went out there and engaged himself. But that is a question of whether or not he accepted the risk, which is an entirely different question. The court did not rule on that, and that would be a jury issue. In other words, there's a jury question as to whether or not he was contributorily negligent, which is the issue the court is getting at. We're not here on that question. We weren't permitted the opportunity to develop a record, and it would be a jury question to begin with. The only question for the court and the only question on which the lower court ruled is whether or not there's a duty. And there very clearly is a duty here. They exercised the actual ability to stop this and just simply ended their efforts in that regard. So there's clearly a duty. There's also a special relationship directly with the Fletchers and with the class, the neighborhood members, of whom the Fletchers are members. In other words, you don't have to have a direct relationship under the case law between the school or the defendants and the Fletchers themselves, but only between the school and a class or a group of which the Fletchers are a member, here the neighborhood residents. And here there very clearly is a special relationship. Is the relevant area apparently a residential area? It is, Your Honor, once you're away from the school, yes. If there had not been a monitoring program in place and this incident had happened, would you still have a claim? We would, but it would be weaker, Your Honor. I see my time's up. I'm happy to explain. Thank you, Your Honor. We would, but it would be weaker, and here's why. The monitoring gives rise to a duty because under 323 of the restatement, once you engage in the monitoring, you have a duty to discharge that appropriately. It gives rise also because it helps underlie the special relationship. But even without the monitoring, the state or the government here still created the danger by moving the bus stop from the school to the neighborhood. There is still also the general common law test for duty, which is met here. What about if they hadn't moved the bus stop and yet this incident had occurred? If they hadn't moved the bus stop and if there was no monitoring, there would be an argument the defense could probably successfully make, and it's always hard to guess at hypotheticals, but there would be an argument the defense could probably successfully make that there was no affirmative state action. That is required. Here the affirmative state action is ceasing the monitoring and moving the bus stop so we can check those boxes, and that's why we haven't seen any significant reliance on that point from the state. I thank the Court. Thank you very much, sir. You have some rebuttal time. Thank you, Your Honor. Ms. Cosley? May it please the Court. Amanda Cosley on behalf of the BCBSC defendants and briefly on behalf of the City of Baltimore, and Mr. Dunkler will be arguing then on behalf of MTA and MSDE. Boy, that was a lot of acronyms. Yes, it is. Do you represent the school? The school system, that would be the easiest way to say yes. BCBSC is the Baltimore City Board of School Commissioners. This actually can be broken down a lot more simply than was previously discussed. How do you make them walk so far to get the bus? Your Honor, there is actually no obligation for the school to have any sort of system in place where the students must take a bus. These students are all high schoolers. Some of them could potentially drive. They can walk wherever they want. In this situation, they actually walked over to Baltimore County, which is where Mr. Fletcher lived, and his house was in Baltimore County, not in Baltimore City. There is no obligation for the state to require any of these students to have gotten on any particular bus. That bus stop, whether it had been where it initially was or moved, was not a requirement for any of them to get on. There is no way that we could have forced them. Did you all provide transportation? There is no actual yellow school bus in Baltimore City. So you didn't have anything to do with the buses? This was the public transportation, and the MTA is who provides the public transportation. But I thought your colleague said that there was a contract between the school and the MTA to provide this service. The schools do. That's the way I heard it. They do work with the students to get them bus passes so that they can access public transportation. So you're providing them with transportation? Yes, with the ability to take it if they so wish. Again, they do not have to do that, and we cannot force each other. Why don't you get the bus to come by the school? In the city, it does not work that way because many of our students are in different locations, the way that it is that some of them can be across the town. These kids are reform school, he says. If you're going to put them on the bus, you pick them up at the door of the school. So they won't be walking through the residential area picking fights. Your Honor, we would argue that there is no duty for that, and that's what this all comes down to, is whether or not there is a duty to Mr. Fletcher. And in this situation, there are two ways that a duty could be found because obviously the state and the local governments are not liable for private violence by a private citizen to another citizen. If you owe a duty to the community, it would run to Mr. Fletcher if he lived around there, wouldn't it? Your Honor, we don't believe that the duty was specifically to the community. Don't you think you have a duty to act reasonably or something? It would be... Would you not put all these troublemaking kids in this one school out in the residential area? Your Honor, in order for there to actually be liability and tort, there needs to be a special duty, a special relationship. It cannot just be to the public as a whole. Does he characterize that thing fairly when he says it's like a reform school? It is a school where students who have had issues in the traditional schools go. However, there is no requirement that they have a criminal record. There's no requirement that they be under any custody. In actuality, these students are not wards of any agency. They're not wards of the state. They're not wards of the school system. They are still students who can leave, and we have... Are they disciplinary problems? Have they been disciplinary problems? Is that the reason they're up here? There could be. There could be, but there's... There could be. There could be, just as any student in our... Well, why are they there, just generally, then? What's it for? Who are the students who get assigned up there? Students who have had some sort of difficulties in the traditional schools, whether it be because there were some type of criminal offenses or simply behavioral offenses in their traditional schools. However, we would still argue that... Is this the only one of those types of schools in Baltimore? There are different schools for different issues. This one, I do believe, was the one that was more of the reform type of school. There's only one of this type. He's correct on that. That is not in the record. None of that is in the record, and all we have is that this is a type of school for that. But what we would argue is that it does not matter whether or not these students have a criminal record or who they specifically are because other students in our other schools throughout the entire system could have issues. And simply because a student has some form of perhaps bad behavior, perhaps a criminal record, does not mean that our duty extends to the public when they leave the school. All right, but your opponent says... Well, he doesn't concede that you didn't have a duty, but he says even if you didn't initially, by creating this monitoring program that you created a duty and at that point you were obligated to continue to do something to protect the neighborhood. What do you say about that? Well, we don't believe that the law actually supports that. We still believe that you need to go back to what a state-created danger is and what it is in order for liability to apply in this case. And that is, first off, an affirmative act. And under the negligence claim, it's not only an affirmative act, but it's an affirmative act that induced the reliance, which would be Mr. Fletcher's reliance. And if we just talk about state-created danger, it means that not only was it an affirmative act, but that we actually caused his injury. And as it was pointed out by Your Honor, Mr. Fletcher actually left his home and approached these individuals who are engaged in an act of altercation. And that's pled that he actually left his home, crossed the street, and engaged with these individuals. But what if he had not? What if he was just walking down the street and they just pounced on him as he was walking to his home? Would he have a claim? We believe he still would not because, again, this duty has to be to Mr. Fletcher. And our duty is not, we do not have a duty to Mr. Fletcher because at no point have we ever created a danger to him. All of the cases talk about when there's actually an individual that an agency has custody of. And the cases are actually very clear. In Lamb v. Hopkins, it very specifically points out how it must be some form of deprivation of rights custody, meaning a person is in the actual custody. So as counsel has pointed out, yes, when a parolee is released and perhaps still has a car from the agency, well, they are still in control of that agency. The cases actually point to situations where an infectious patient is released from a hospital or a homicidal maniac is negligently escaped from a prison. Well, the question is, under Section 323, and I'm not sure that the appellant is reading that correctly, it talks about the actor may normally abandon his efforts at any time unless by giving the aid he has put the other in a worse position than he was before the actor attempted to aid him. So in response to my question, Mr. Fletcher had not had trouble with his children, but he engaged them when he had them. But he wasn't in a worse position when you took the people away, was he? Correct, Your Honor. And they're actually putting this, what we're calling a monitoring program, again, did not change Mr. Fletcher's situation. It was simply a program that at best was monitoring these students to get out of the grounds of the school. That would then, what they are arguing, would extend the duty of the school to continuously monitor our students 24-7. Because where would this end? Again, a bus stop moving one block away, well, do we then have to monitor them on the bus and when they get home and in their communities? Perhaps some of them even lived in this community. Do we then have to walk them to their door? It's simply a slippery slope that the plaintiff is trying to create a relationship with the school system and everyone in the community. And we do not believe that there's any case law that supports that. It's very clear-cut that a special relationship must be an affirmative act. At this time, there was no affirmative act. There is no duty for failure to protect. The governmental entities, specifically CBSC, does not have the obligation under tort for a failure to protect. And at best, that's what we have here, is a failure to protect claim. But without a duty to Mr. Fletcher, we do not have the duty to protect him. And that also goes to the 1983 claims. They're very similar, the negligence of the 1983 claims, in the sense that there was no duty. And without a special relationship, no matter how egregious this was, the school system simply was not liable. And on alternative grounds, there also is immunity from suit in this case. BCBSC does have sovereign immunity. It is waived under Courts and Judicial Proceedings 5518. And under that, it is an indemnification. Was anything about immunity ruled on? It was not ruled on, Your Honor. It was briefed, though. In the district court? Correct. It hasn't been briefed here, has it? It was in the district court. It was ruled on. Correct, Your Honor. Why would we be dealing with it? Well, we believe that if Your Honors did not wish to affirm on the grounds that Judge Mott's rule, it would be an alternative grounds. Yes, but we do believe that affirming on the ground that Judge Mott's did would be appropriate because, again, there is – And this is what kind of immunity? Sovereign immunity? There is sovereign immunity. There's also public official immunity and qualified immunity. Specifically for BCBSC, it was – So that runs to the Baltimore school? Yes, Your Honor. Where does the qualified immunity run? That would be to Dr. Thornton, who was sued in his official capacity. He was the CEO of the school system, and he is the only named person from the school system. And it is – while it does say sued in his official capacity and individual capacity, all of the allegations are about his acts as an official – Qualified immunity runs to the individual capacity, right? Yes, it would be for his official – The 1983 claim. The 1983 claim, but it has to be that he actually deprived Mr. Fletcher of a constitutional right. And without him actually making that act, which there is no allegation, that he made that act. At best, there are claims that they are discretionary acts that he made as a public official. But without any – To find out all that, you'd have to have discovery, wouldn't you? Well, but it was not a play. You couldn't do that. You couldn't do that. This was a clear on a motion to dismiss. Correct, Your Honor, but none of that was play. We have to set it back. We're going to rule on that. We have to set it back to discovery. Well, we believe that with what was played, that could be ruled on simply as it was played. We don't believe that any – The plaintiffs never asked to amend their complaint. Even though they did ask for a motion to reconsider, they never asked to amend. Therefore, we don't believe that any amendment would be able to change the fact that nothing has played to get past the immunity. But more importantly, nothing has been played to show that there was a special relationship with Mr. Fletcher and the school system. Because that is where the relationship must lie, is between the two of them. And nothing has been played. There has been no danger created. Even if the monitoring system was put in place by the system, the lack thereof did not create this danger. Because that would then have to assume that we are therefore liable for every action these children take when they leave the school system, which just simply is not what the law is. When they leave, they are therefore then off the grounds and no longer in the custody of the school system. The school system simply stands in loco parentis while they are in their control, meaning at a school function or the school itself. They cannot continue to be their parent 24-7 and throughout their continuance. So again, there has been no affirmative act by the school system that therefore induced plaintiffs to rely on it. Because the plaintiff actually admits that he walked outside and he knew this was not going on. There was no longer monitoring. So he did not rely on anything from the school system. And we do stand by the argument that there was no state-created danger. And I do see that my time is up now. And unless Your Honor has any further questions, I'll turn it over to Mr. Dunklow. Thank you. Mr. Dunklow. Thank you, Your Honor. May it please the Court. Alan Dunklow, Assistant Attorney General on behalf of the state agencies and personnel named in this case. Ultimately, this case is about private violence that occurred on a public street and the limits of tort and other liability against the government as it serves the public. I'll be arguing first that recovery is barred against each of the state personnel that have been named. How many are there? There's two state personnel. How many clients have you got here? I represent the Department of Education, which includes the Director Langley, and then the Department of Transportation, which includes the Transit Administration and Secretary Rahn. So you've got five clients? Yeah, by my count, yeah. And so then we'll argue that Mr. Fletcher failed to state a claim under either 1983 or negligence. So as I mentioned, Secretary Rahn has been named on behalf of the Maryland Transit Administration and Director Langley on behalf of the State Department of Education. And they've been named in both their official and personal capacities. However, as Ms. Cossley mentioned, there's no allegations of direct or personal involvement by either, just the general allegation that the state failed to provide appropriate transportation or to address the community safety concerns. But it's apparent from the face of the complaint that they're named by virtue solely of their public offices and the mission of their agencies, and therefore the 1983 claims must be dismissed against them because acting in their official capacity, state personnel do not constitute a person under the Will case law. And any dispute about whether or not they were also named in their personal capacity can be resolved, again, by the substance of the complaint, which this court looks at, and the fact that these are really official complaints. With regard to the negligence, that claim must also be dismissed against the state personnel because state personnel retain their immunity to suit under Courts and Judicial Proceedings Article 5-522 for acts or omissions that are within the scope of their public duties, that are made without malice or gross negligence. And as the Barbary case points out, that's a high bar. Malice involves evil or wrongful motive, a purpose to injure. Gross negligence involves willful or wanton behavior, an intentional failure to perform a manifest duty. And as we discuss here, there is no duty at all. Rather, Secretary Rahn and Director Langley are state personnel acting within the scope of their public duties, and any alleged bureaucratic mismanagement or failure to do more on behalf of the community is not enough to surpass that standard. So with no liability attached to the state personnel, I'd like to turn to the agencies. And again, because the state and its agencies, like its personnel, are not persons under Section 1983, Mr. Fletcher's 1983 claim against the Department of Ed, the Department of Transportation, and the Transit Administration, the three state agencies, must also be dismissed as a matter of law. Not only is negligence not a deprivation of liberty, but also the failure to protect from a third party is also not sufficient under the DeShaney case law. So all that we have remaining then is the negligence claim against the state agencies. And the Maryland Tort Claims Act does represent a limited waiver of states' immunity under Section 12-104 of the state government article. But Mr. Fletcher has failed to state a claim for negligence. The key element, duty, is missing here. And it's important to note that the existence of a duty is a matter of law that is appropriate for dismissal, and that's how this case was dismissed at the district court level. Put simply, there's no duty for the state to protect Mr. Fletcher from his assailants, unless such duty is created by statute or special relationship. The statutes are quite clear, and it really isn't argued below that there was any statutory duty. The education agency provides funding. It regulates, but it doesn't operate individual schools or supervise students. These are quintessentially public duties. And to the extent that they regulate it, it largely focuses on rider safety, about avoiding railroad tracks and crossing multiple lanes. Mr. Fletcher is not within the class that those regulations are intended to protect, nor is this one of the harms that those were intended to prevent. With regard to the transportation agency, they provide mass transit to the public at large. As was noted initially in Your Honor's questions, federal law actually prohibits exclusively transporting students. That's in 49 U.S.C. 5323. And so it's important to note that this bus stop was utilized as a public service, and so students can't be a specific class in this context. And while there could be a duty of care to passengers as a common carrier, that duty does also not extend to the community at large or someone like Mr. Fletcher who is not on a bus. And so as Ms. Costley... They could negotiate to get a better bus stop. I'm sorry? They could negotiate to get a better location. They could absolutely do that. And there was community advocacy around, as fled in the complaint, around they like to stop near the school as opposed to a number of blocks away. But it's important to note that that bus stop, regardless of where it was placed, was a public bus stop to be used by all. And as was noted below, these students were not in a custodial relationship either with the school, once dismissal happened, or with any sort of Department of Juvenile Services. And so once they left, they could have walked. And I think Mr. Hansel acknowledged that they could have walked elsewhere. They could have taken another bus. And so the lack of control means that any sort of monitoring program would ultimately be ineffective. Although it was attempted, that affirmative act did not put Mr. Fletcher in any worse condition than having individuals walk through the community and engage in private violence. And so Maryland precedent is consistent on this point. Even where, as here, we have tragic results. This started with Ashburn in 1986, where the police did not detain an intoxicated driver. Instead, told him to stay parked. He drove away and injured a pedestrian. And that follows all the way through to McNack in 2007. But it's important to note that this standard that relates to police officers and law enforcement was briefed below that this should be a case of first impression. But ultimately, in Muthukumarana, a 2002 case from the Maryland Court of Appeals, they noted that this is a general standard that is used to preserve case-by-case review. It was equipped to deal with 911 operators. It's equipped to deal with other agencies. And so here the state specifically had no relationship with Mr. Fletcher's assailants. I'm just walking through the two alternative grounds of special relationship that Mr. Hansel mentioned. The school and pupil relationship had ended. And as for the state education agency, Your Honors, it never even began. Any alleged monitoring would have involved student supervision, which the State Department of Education does not do. And the state had no relationship with Mr. Fletcher because those bus stops are located as a service to the public, not just students. They're not an affirmative act for the benefit of a particular person, nor are there any facts alleged to show reliance on the state's protection. In fact, Mr. Fletcher left his home, which indicates a lack of reliance. So even assuming all facts in the light most favorable to Mr. Fletcher, this is a case of private violence on public streets, and the state's role in funding and regulating public education or in providing mass transit to all citizens is simply not sufficient to sustain a claim for either 1983 or negligence. Thus, the state agencies and their personnel must be dismissed. For that reason, this court should affirm the district court's decision. Thank you.  Mr. Hansel? Thank you, Your Honor. I'd like to focus some time on the special relationship between the defendants and the students. This does not rely on Section 323 of the restatement. It does not rely on efforts to protect the neighborhood. Instead, there is a special relationship between those in charge of persons with known dangerous propensities and those that have custody of others. That's Ashburn v. Anne Arundel County. What's interesting about that, and to answer Judge Diaz's question, it separates those in charge of persons with known dangerous propensities and those with custody of others as two separate tests. If you merely are in charge, not custody, and the person has a dangerous propensity, then the test is met. The state defendants, in effect, want to argue there is a lack of custody, but they cut the analysis in half and ignore that if you are in charge, if you have some ability to control, literally interpreted, a person with dangerous propensity, then the test is also satisfied. Again, that's Ashburn v. Anne Arundel County. How does that apply to the State Board of Education and the Maryland Transit Authority? The Maryland Transit Authority and the State Board, here's a problem we have. Everyone on the defense side is going like this. They're pointing at each other. Nobody has any authority according to them. Not one of them has authority over where to put the bus. Not one of them has authority over what to do about these students. But at least with respect to the Maryland Transit Authority, what does that matter? They're not in charge of the students. Because I think, Your Honor, it comes down to a question of contract and whether or not their contract required them to pick students up at the school, and we can't answer that without discovery. We know there was a contract between the school and the MTA so that the school had some ability to control the MTA. Are there distinctions between the various defendants? Yes. Did the district court make them? Unfortunately, no, which is yet another reason we are all, the court and the parties, handicapped by what amounts to a one-paragraph decision. But what is clear is that at least between some of the defendants Maybe you should add a rifle shot complaint rather than a shotgun complaint. I didn't draft the complaint, Your Honor, but at least as to some of the Well, you're the only lawyer we've got here that's arguing about it. It's my responsibility and I accept it. You're the only lawyer and you're the one that's got it here. I understand, Your Honor, but I want to make clear to the court, if there is control, not just custody, of someone with a dangerous propensity, then there is a special relationship that gives rise to a duty. There is also a separate special relationship between a school and pupils. Generally, that's Valentine versus on target. So what we have here is a special relationship that creates the duty between these students. In terms of drawing a line, I think this case is perfect for drawing it on the plaintiff's side of the equation because there is the demonstrated ability to control the students through monitoring and because the policies of the school state that they apply to students at all times, this is a quote, while they are on city school property and while traveling to and from school or any school-sponsored activity. So the school has accepted for itself the very responsibility on which it is sued. It has not only accepted that responsibility, but indeed has undertaken to discharge it, by actually providing the monitoring. So here we see the ability, again, to return to the case law, to control, which is what's important, not custody, not whether or not down the line there might be an immunity defense or down the line there might be a question of whether or not there was any negligence on the part of our client, but we're here on the question of duty. As to immunity, the answer is simple. The Maryland Tort Claims Act and the Local Government Tort Claims Act in Maryland waive immunity in different circumstances that are beyond probably the scope of the minute I have left on behalf of both the individuals and the government. So immunity is waived pursuant to those acts based on determinations the jury must make as to malice and gross negligence. Even if there is no malice or gross negligence, the government is liable. If there is, the individuals are liable. That's from 1,000 feet in the air. There's a lot of ifs, ands, or buts. But the answer to immunity is it's been waived. There are statutory means of dealing with it with respect to the state law claims. As to the federal claims, the question comes down to qualified immunity, and these are all very clearly established rights, and so there is no qualified immunity. And, indeed, we don't have a ruling on that below. I would suggest to this Court that, number one, we'd need a reasoned ruling on it below. We'd need a reasoned ruling to review that made the important distinctions between different immunities and different parties, and we'd need, as the Court has already suggested, our right to engage in discovery, which, of course, would be critical to some of those defenses. And, instead, what we have is really a one-paragraph analysis of a case that deserved a lot more attention due to the extreme danger to this community from these students who are, and I think you heard it best from my counterpart, what amount to some of the most dangerous folks in Baltimore. Everybody with these behavioral problems, everybody with criminal problems in a city that, unfortunately, and I live there, is known for those issues, was shuttled to this one area. These events, it's in the papers, happened three days after the death of Freddie Gray, when the city was on high alert, to put it politely, at a time when it should have been clear to the school that their charges had extremely dangerous propensities that were, at the moment, stirred up and on fire and, unfortunately, were directed to the Fletchers. I see my time is up. I'm happy to answer any questions. Hold that red light, please. Yes, Your Honor. Thank you for your time. Thank you, Mr. Chancellor. We'll come down and re-counsel and then go to the next case.
judges: Robert B. King, Albert Diaz, Henry F. Floyd